# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA      :
                                :     Criminal Action No. 08-40-SLR
          Plaintiff,       :
     v.                          :
                                  :
LAMOTTE STEVENSON, a/k/a     :
LAMONT STEVENSON,          :
                                  :
          Defendant.     :

## GOVERNMENT'S POST-HEARING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Defendant Lamotte Stevenson filed a Motion to Suppress Statements seeking to exclude all of his statements following his purported illegal seizure on February 10, 2008  (Doc. No. 13.)  On June 11, 2008, the Court held an evidentiary hearing during which one witness, Wilmington Police Officer Michael Gifford, testified.  The facts as set forth by Officer Gifford, and the applicable principles of law, establish that the Defendant's statements are admissible.[1]  For that reason and the reasons set forth below, the Government respectfully requests that the Court deny Defendant's motion.

## I.    Proposed Findings of Fact.

### A.    *The Defendant Drives Himself To St. Francis Hospital After Being Shot.*

At around 12:27 A.M. on February 10, 2008, Officer Gifford was on call when he heard a report over his radio.  (Tr. at 4-5.)  The report indicated that a patrol car had observed a vehicle traveling at a high rate of speed through the City of Wilmington that had stopped at St. Francis

---

[1]Some parts of Defendant's Motion suggest that he is seeking to suppress physical evidence in addition to his statements.  (See Doc. No. 13 ¶ 12.)  As explained herein, the Defendant's statements and any evidence seized from his vehicle are admissible.

Hospital.  (Id. at 4.)  The vehicle was pursued by Officers Rennewanz and Souden and was "blowing lights."  (Id.)  Driving the vehicle was an individual who had been shot.  (Id.)  Officer Gifford also learned from his radio that there had been shots fired at the BP gas station at Martin Luther King and West Streets.  (Id.)

Officer Gifford responded to St. Francis Hospital, arriving in about twenty minutes.  (Id.)  Upon arriving Officer Gifford saw Officer Rennewanz outside the hospital by a vehicle that had sustained bullet holes and had its windows shot out.  (Id.)  Officer Rennewanz told Officer Gifford that there was a gun inside the vehicle and the victim was inside the hospital.  (Id.)

Officer Rennewanz told Officer Gifford that he had been with the vehicle since the driver arrived at the hospital.  (Id. at 6.)  No other civilians were near the vehicle, and Officer Rennewanz told Officer Gifford that no one else had been around the vehicle.  (Id.)  He also told Officer Gifford that the only person inside the vehicle when it arrived was the driver who he identified as Lamotte Stevenson, the Defendant.  (Id.)  Officer Gifford recognized the Defendant's name and knew he was a convicted felon.  (Id. at 6-7.)

**B.**     ***Officers Observe A Firearm In Plain View Inside The Defendant's Vehicle.***

Officer Gifford saw the gun that Officer Rennewanz spoke of on the driver's side floor board of the vehicle.  (Id. at 7.)  He could see the gun without any difficulty while standing outside the vehicle.  (Id. at 7-8.)  During the evidentiary hearing, Officer Gifford identified three photographs of the gun that show the gun in plain view on the floor in front of the driver's side front seat.  (Govt. Exs. 1, 2, & 3.)  Officer Gifford testified that those photographs are a fair and accurate description of what he saw that night.  (Tr. at 8.)  Officer Rennewanz told Officer

2

Gifford that no one else had been near the gun since the Defendant arrived.  (Id. at 7.)  Officer

Gifford knows that no guns are manufactured in Delaware.  (Id. at 8-9.)

### C.    *Officer Gifford Arrests The Defendant.*

The next day, Officer Gifford learned that the Defendant was being discharged from

Christiana Hospital.  (Id. at 9.)  The Defendant had gone to Christiana Hospital for treatment for

his gunshot wound.  (Id.)  At the time the Defendant was being released, no police officers were

at the hospital with the Defendant.  (Id.)  Upon learning that the Defendant was to be released

from Christiana Hospital, Officer Gifford went to the hospital and arrested the Defendant.  (Id.)

### D.    *The Defendant Is First Questioned About An Unrelated Murder In Which He Was Not A Suspect.*

After arresting the Defendant, Officer Gifford took him to the Wilmington Police Station.

(Id. at 10.)  About an hour later, Officer Gifford interviewed the Defendant.  (Id.)  Officer

Ciritella interviewed the Defendant immediately prior to Officer Gifford.  (Id. at 10.)  Both

interviews were video recorded.  (See Govt. Ex. 5.)[2]

 Officer Ciritella spoke to the Defendant for about eight minutes and fifteen seconds

without first advising him of his Miranda rights.  (Tr. at 12; Govt. Ex. 5 at 21:45 – 30:00.)

Generally, Officer Ciritella told the Defendant that he was being charged with a federal gun

offense pursuant to the FED UP program, and then asked the Defendant if he wanted to talk

about about an unrelated murder involving a suspect named Shannon Johnson.  (Id.)  At the

---

[2]Statements from the Defendant's two interviews are cited herein according to the approximate time the statements appear in Government Exhibit 5.  The Defendant's first interview with Officer Ciritella begins at approximately 21:45 in Government Exhibit 5.

beginning of the interview, Officer Ciritella is heard introducing himself and then saying the

following to the Defendant:

> I understand you're getting charged today?  With a gun offense?  They're going to take you federally?  You know what happens in that program, the FED UP program?  What happens is you're going to go over there, and you're going to get no bail, or if you do get bail it's going to be real high, so you're probably not going to be able to get out.  So, you might want to start thinking about some things.  I know you were, uh, tight with Shannon, so if there's anything in reference to those incidents you want to talk to me about, I'm more than willing to listen, okay?  Uh, but you may want to think about that as a, uh, alternative for you because with the FED UP program, ain't nobody getting out, you know what I mean?

(Govt. Ex. 5 at 21:50 – 22:34.)

The Defendant claimed he did not know anything about the murder, stating, "Yeah, I

don't know nothing, I'm straight, they can just take me on over."  (Id. at 22:41 – 22:45.)  The

Defendant and Officer Ciritella then engaged in a discussion wherein Officer Ciritella made it

clear that he only wanted to talk to the Defendant about the murder, and the Defendant made it

clear that although he did not want to discuss the murder, he would speak about his own case:

| | |
|---|---|
| Defendant: | I'm here for my case right now. |
| Officer Ciritella: | Right, but I'm not talking to you about your case right now. |
| Defendant: | Well, I don't want to talk then, if it ain't about my case.  I don't want to talk about nobody else's case. |
| Officer Ciritella: | Huh.  Well, you're not arrested on the other cases. |
| Defendant: | Huh? |
| Officer Ciritella: | You're not under arrest on the other cases. |
| Defendant: | On a gun charge, and it wasn't even my gun, so I'm not even worried about this shit at all. |

| | |
|---|---|
| Officer Ciritella: | Right.  On this case. |
| Defendant: | Yeah, on this case. |
| Officer Ciritella: | But everything with Shannon Johnson, right, you're not being arrested for those things. |
| Defendant: | I had nothing to do with it.  I wasn't ever with him. |
| Officer Ciritella: | Right. |
| Defendant: | I aint got nothing to do with that |
| Officer Ciritella: | Right. |
| Defendant: | I ain't no flunky. |
| Officer Ciritella | Huh? |
| Defendant: | I ain't nobody's flunky. |
| Officer Ciritella: | You calling Shannon a flunky? |
| Defendant: | I said I'm not nobody's flunky. |
| Officer Ciritella: | Oh.  That's to say you're just not going to rat on him.  So, you know what happened, but you just not going to rat on him. |
| Defendant: | I said I don't know what's going on.  I don't want to talk about nobody's case, but mine.  That's what I said. |

(Id. at 23:01 – 24:06.)

The Defendant and Officer Ciritella proceeded to discuss a number of topics, including:

(i) whether the Defendant needed Officer Ciritella's help, (id. at 24:12 – 24:22); (ii) whether the

Defendant could sue the police for arresting him, (id. at 24:23 – 25:22); (iii) whether the

Defendant was going to be able to beat the gun charges against him, (id. at 25:23 – 26:23); (iv)

whether the Defendant would testify at Shannon Johnson's trial, (id. at 26:24 – 26:53); (v)

whether Shannon Johnson would be convicted, (id. at 26:54 – 27:24); (vi) whether Shannon Johnson would implicate the Defendant in the murder, (id. at 27:25 – 28:16); and (vii) whether the Defendant would help Officer Ciritella, (id. at 28:17 – 30:00).  Defendant did not make any incriminating statements, nor did Officer Ciritella attempt to elicit any such statements.  Officer Ciritella's sole purpose in questioning the Defendant, as demonstrated by the video, was to convince the Defendant to provide information against Shannon Johnson in relation to the murder.  The Defendant repeatedly refused to provide any information, explaining that he only wanted to talk about his own case.  Officer Ciritella then left the room.

**E.**     ***The Defendant Is Next Questioned About The Shooting In Which He Was A Victim.***

The Defendant was left alone for approximately six minutes before Officer Gifford entered the room.  (Id. at 36:03.)  Officer Gifford made it clear from the beginning of the interview that he first wanted to talk to the Defendant about the shooting in which the Defendant was a victim, stating, "I want to go over this shooting thing with you, real quick, again."  (Id. at 36:04 – 36:14.)  Officer Gifford then asked the Defendant questions about the shooting.

About four-and-a-half minutes into the interview, the Defendant asked Officer Gifford to unhandcuff his right hand so he could write information about the shooting, (id. at 40:41), and Officer Gifford got keys and unhandcuffed the Defendant, (id. at 41:40).  Officer Gifford then continued asking the Defendant questions about the shooting.

Twice during the interview Officer Gifford deceived the Defendant by telling him the interview was not being recorded.  (Id. at 40:11 & 42:58; see also Tr. at 30-31.)

**F.**    ***The Defendant Is Advised Of His <u>Miranda</u> Rights, Waives His Rights, And Answers Questions About The Firearm.***

Approximately twelve minutes into his interview, Officer Gifford informed the Defendant that he wanted to switch topics and discuss the gun that was found in the Defendant's car.  (Govt. Ex. 5 at 47:57.)  When the Defendant tried to make a statement, Officer Gifford interrupted him and said that he had to advise the Defendant of his rights first.  Officer Gifford then advised the Defendant of his rights, and the Defendant responded that he understood those rights and agreed to answer questions:

| | |
|---|---|
| Officer Gifford: | . . . I've heard what you told me about the gun, I heard what you told Detective Ciritella about the gun . . . |
| Defendant: | Yeah, because I'm a tell you, I'm a tell you . . . |
| Officer Gifford: | All right, well, before I talk to you about the gun though, I got to advise you of your rights just because that's what you're here for, ok?  Do you understand that? |
| Defendant: | [nodding] |
| Officer Gifford: | I don't want to . . . I'm talking to you as a victim right now in this thing I don't got to advise you of your rights, you're going to tell me or you're not going to tell me.  But because you want to talk to me about the gun I got to advise you of your rights, do you understand that? |
| Defendant: | [nodding] |
| Officer Gifford: | Ok.  You know what they are? |
| Defendant: | [nodding] |
| Officer Gifford: | You have the right to remain silent.  If you give that right to . . . if you give up the right to remain silent, anything you say can and will be used against you in a court of law.  Do you understand that? |
| Defendant: | Um hum. |

| Officer Gifford: | You have the right to an attorney. If you can't afford one, one will be provided for you free of charge. Do you understand that? |
| --- | --- |
| Defendant: | Um hum. |
| Officer Gifford: | You have the right to stop asking questions at any time and ask for a lawyer. Do you understand that? Given that in mind, is it allright if you and I talk about this gun that was in your car? |
| Defendant: | Yeah, it really won't change nothing will it? I'm still charged with it. |
| Officer Gifford: | Not right now, but you know what? There's a lot of things that are gonna go on, dude. The problem is is this and I'm a be straight with you. The police followed you to the hospital. They don't see nobody else get out of your car the entire time, right? You're on video there's . . . the only person we see in your car before all this right is you. |

(Govt. Ex. 5 at 47:57 – 49:13.)

The Defendant then answered questions about the gun. (Id. at 49:13 – 51:12.) The

Defendant claimed his "Mom" owned the gun.[3]  (Id. at 50:08.)

### G. *The Defendant Is An Intelligent Adult Who Has Substantial Experience With The Criminal Justice System.*

Officer Gifford testified that the Defendant's records indicate that he is between twenty-

three and twenty-five years old and has seventy-nine total reported arrests, including ten felony

arrests. (Tr. at 17; Govt. Ex. 4.) The video-taped interview of the Defendant demonstrates that

the Defendant is an adult who is able to intelligently decide whether to answer questions, and

whose responses are clear and logical.

---

[3]The Government intends to show at trial that the Defendant's statement that his "Mom" owned
the gun was false.

II.    **Proposed Conclusions of Law.**

The Defendant moves to suppress all evidence and statements on the grounds that he was arrested without probable cause or reasonable suspicion.  (Doc. 13  ¶ 11.)  Defendant also claims that he did not knowingly, voluntarily, and intelligently waive his <u>Miranda</u> rights.  (<u>Id.</u> ¶ 15.)  For the reasons that follow, Defendant's motion should be denied.

A.    ***The Defendant Was Not Seized Until He Was Arrested At Christiana Hosptial On February 11, 2008.***

A suspect approached by law enforcement is not seized unless a reasonable person in the suspect's circumstances would feel unable to terminate the encounter.  <u>See, e.g.</u>, <u>United States v. Lockett</u>, 406 F.3d 207, 211 (3d Cir. 2005).  A suspect who voluntarily seeks medical help is not seized merely because he or she is accompanied by law enforcement personnel.  <u>See, e.g.</u>, <u>Reinert v. Larkins</u>, 379 F.3d 76, 87 (3d Cir. 2004); <u>United States v. Overington</u>, No. 07-147, 2007 WL 3119843, at *4 (E.D. Pa. Oct. 24, 2007).

Here, contrary to the assertion made in Defendant's Motion, there is no evidence that the Defendant was seized on February 10, 2008.  The evidence shows that Defendant voluntarily drove himself to St. Francis Hosptial on February 10.  (Tr. at 4-7.)  The Defendant then went to Christiana Hospital where he remained without the company of any law enforcement officers.  (<u>Id.</u> at 9.)  Officer Gifford only went to arrest the Defendant when he learned on February 11, 2008, that the Defendant was about to be released from Christiana Hospital.  Under the circumstances, it is clear that the Defendant was not seized until February 11, 2008.  <u>See</u> <u>Overington</u>, 2007 WL 3119843, at *4 (holding that the defendant was not seized because

"Defendant voluntarily entered the hospital as the victim of a possible crime, and any restraint on his freedom of movement was for medical rather than investigative purposes").

**B.    *The Officers Had Probable Cause To Arrest The Defendant.***

"Probable cause to arrest exists when the information within the arresting officer's knowledge at the time of the arrest is sufficient to warrant a reasonable law enforcement officer to believe that an offense has been or is being committed by the person to be arrested." Paff v. Kaltenbach, 204 F.3d 425, 436 (3d Cir. 2000). It "is a fluid concept-turning on the assessment of probabilities in particular factual context – not readily, or even usually, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). "While probable cause to arrest requires more than mere suspicion, the law recognizes that probable cause determinations have to be made 'on the spot' under pressure and do 'not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands.'" Kaltenbach, 204 F.3d at 436 (quoting Gerstein v. Pugh, 420 U.S. 103, 121 (1975)). Courts apply a "common sense approach," based on the "totality of the circumstances, to determine whether law enforcement officials had probable cause to arrest." Id. (citing Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997)).

On February 11, 2008, when he arrested the Defendant, Officer Gifford plainly had sufficient reasons to reasonably believe that the Defendant had possessed a firearm, after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) (2008). At that time Officer Gifford knew that (1) the Defendant was a convicted felon; who (2) the day before, had been driving a vehicle with a loaded firearm in plain view on the floor in front of the driver's seat; (3) the Defendant was the sole occupant of that vehicle; and (4) no firearms are manufactured in

Delaware.[4]  These facts clearly gave Officer Gifford probable cause to arrest the Defendant.  See, e.g., Maryland v. Pringle, 540 U.S. 366, 372 (2003) (where police officers searched a vehicle and recovered $763 and "five plastic glassine baggies containing cocaine from behind the back-seat armrest," the Supreme Court held that it was "an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine"); United States v. Holder, 990 F.2d 1327, 1329 (D.C. Cir. 1993) (holding that the officers had probable cause to arrest the defendant for possession of illegal drugs because, "[t]hat [the defendant] was present, for whatever reason, when the drugs were in plain view, however, makes it more likely than not that he was involved in some way in the criminal activity, and that amply satisfies probable cause").

Officer Gifford also had probable cause to arrest the Defendant for Carrying a Concealed Deadly Weapon in violation of 11 Del. C. § 1442 (2008).  Even though the gun was in plain view on the floor of the Defendant's vehicle, it still would likely be considered "concealed" for purposes of 11 Del. C. § 1442.  See, e.g., Robertson v. Delaware, 704 A.2d 267, 268 (Del. 1997) (upholding the defendant's conviction for Carrying a Concealed Deadly Weapon in violation of 11 Del. C. § 1442 even though "one of the officers shone a flashlight into the car and observed the butt of a pistol protruding from under the passenger seat").  Under Delaware law, the Defendant bears the burden at trial to show that his possession of the gun was lawful.  See, e.g., Lively v. Delaware, 427 A.2d 882, 884 (Del. 1981) (possession of a license is best viewed as an affirmative defense to a charge of carrying a concealed deadly weapon since it is a matter more

---

[4]Indeed, Officer Gifford knew all these facts when he arrived at St. Francis Hospital on February 10, 2008.

immediately within the knowledge of the defendant himself and more readily proven by him). Thus, Officer Gifford could also have arrested the Defendant for Carrying a Concealed Deadly Weapon. For all of these reasons, the Defendant's claim that Officer Gifford lacked probable cause to arrest him should be rejected.

**C.**    ***The Defendant Knowingly, Intelligently, And Voluntarily Waived His <u>Miranda</u> Rights.***

To introduce in its case-in-chief statements a defendant makes while in custody, the Government must show that prior to making the statements the defendant knowingly, voluntarily, and intelligently waived his <u>Miranda</u> rights. <u>See</u> <u>United States v. Wooding</u>, 530 F. Supp. 2d 681, 685 (D. Del. 2008). "To be voluntary, the defendant's waiver must be the product of a free and deliberate choice rather than the result of intimidation, coercion or deception. To be knowing and intelligent, the defendant's waiver must be made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them." <u>Id.</u>

The validity of a defendant's waiver of his <u>Miranda</u> rights is determined by looking at the totality of the circumstances. <u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987). A court should look to the particular facts of a given case, including the defendant's background, experience, and conduct. <u>United States v. Velasquez</u>, 885 F.2d 1076, 1086 (3d Cir. 1989). Also relevant are the defendant's age, education, intelligence, mental health, drug use, and prior experience with the criminal justice system, as well as the length of his detention, whether the questioning was repeated or prolonged and whether the defendant was subject to physical punishment such as the deprivation of food or sleep. <u>See e.g.</u>, <u>United States v. Jacobs</u>, 431 F.3d 99, 108 (3d Cir. 2005); <u>Miller v. Fenton</u>, 796 F.2d 598, 604 (3d Cir. 1986). Here, the totality of the circumstances shows

that the Defendant knowingly, voluntarily, and intelligently waived his <u>Miranda</u> rights prior to making statements to Officer Gifford.

The fact that the Defendant answered questions after being advised of his <u>Miranda</u> rights, and acknowledging that he understood those rights, is strong evidence that the Defendant knowingly and intelligently waived his rights. <u>See, e.g.</u>, <u>Patterson v. Illinois</u>, 487 U.S. 285, 293 (1988) ("Indeed, it seems self-evident that one who is told he has such rights to counsel is in a curious posture to later complain that his waiver of these rights was unknowing.") (quotations omitted); <u>see also</u> <u>United States v. Velasquez</u>, 626 F.2d 314, 320 (3d Cir. 1980) ("We hold that on this record [the defendant's] subsequent willingness to answer questions after acknowledging that she understood her <u>Miranda</u> rights is sufficient to constitute an implied waiver under <u>Butler</u>."). Other factors indicating that the Defendant understood his rights include the facts that the Defendant is an adult who has subtantial experience with the criminal justice system and who on the video was able to intelligently answer questions. <u>See, e.g.</u>, <u>United States v. Cottman</u>, 497 F. Supp. 2d 598, 605-06 (D. Del. 2007) (in deciding that the defendant voluntarily made statements and waived his <u>Miranda</u> rights, finding relevant the facts that the defendant was 31 or 32 years old and had prior experience with the criminal justice system); <u>United States v. Pruden</u>, 398 F.3d 241, 246 (3d Cir. 2005) (finding that the defendant knowingly waived his <u>Miranda</u> rights in part because the defendant "was familiar with his rights, having been involved in the justice system on numerous previous occasions").

Finally, the fact that the Defendant refused to answer Officer Ciritella's questions – before he was even advised of his rights – shows that the Defendant knew he did not have to speak to the police. <u>Cf.</u> <u>United States v. Velasquez</u>, 885 F.2d 1076, 1087 (3d Cir. 1989) (holding

that the defendant's <u>Miranda</u> waiver was knowing and intelligent in part because "Velasquez evidently understood the import of the Miranda warnings given by Durnan, because she invoked her right to counsel one half-hour before she made her incriminating statements."). For all of these reasons, the totality of the circumstances shows that the Defendant knowingly and intellgently waived his <u>Miranda</u> rights when he spoke to Officer Gifford.

The totality of the circumstances also shows that the Defendant voluntarily waived his rights. The Supreme Court has stated that a <u>Miranda</u> waiver must have been voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). Here, the evidence shows that Officer Gifford did not threaten or deceive the Defendant, except that he deceived the Defendant by twice telling him the interview was not being videotaped. (Tr. at 30-31; <u>see also</u> Govt. Ex. 5 at 40:11 & 42:58.) The fact that Officer Gifford misled the Defendant into believing the interview was not being recorded obviously does not affect the validity of the Defendant's <u>Miranda</u> waiver. <u>See, e.g.</u>, <u>Moran</u>, 475 U.S. at 423 (holding that the police officer's failure to inform the defendant that his sister had retained an attorney to represent him did not affect the validity of his waiver of his <u>Miranda</u> rights); <u>Velasquez</u>, 885 F.2d at 1089 (holding that the defendant's <u>Miranda</u> waiver was voluntary despite the police officer's deception because "Although the deception may have been a partial cause of Velasquez's statements, we do not think that her will was overcome or her capacity for self-control vitiated.").

The evidence also shows that Officer Gifford did not make any promises to the Defendant. Indeed, the Defendant made it clear that he understood that he would be charged with possessing the gun regardless of whether he spoke to Officer Gifford. (<u>See</u> Govt Ex. 5 at

48:48 (defendant responding to Officer Gifford's request to answer questions, "Yeah, it really

won't change nothing will it?  I'm still charged with it.").)  Even if the Defendant hoped he

would receive leniency by talking, that does not make his waiver involuntary.  Cf Alston v.

Redman, 34 F.3d 1237, 1254 (3d Cir. 1994) ("In light of Alston's age, literacy, and prior

experience with the criminal justice system, as well as the limited nature of the promise made by

the investigators, a promise to make a non-binding recommendation to the prosecutor, the Court

finds that Alston's written waiver of his Miranda rights on August 29th was not coerced.").  The

fact that the Defendant intended his post-Miranda statement to be exculpatory also indicates that

he knowingly, voluntarily, and intelligently waived his rights.  For all of these reasons, the

Government submits that the Defendant knowingly, voluntarily, and intelligently waived his

Miranda rights.

>    **D.    Under _Oregon v. Elstad_, The Two Pre-_Miranda_ Interviews Do Not Require
>          Suppression Of The Defendant's Post-_Miranda_ Statements.**

The Government concedes that the Defendant's responses to Officer Ciritella, and his

pre-Miranda responses to Officer Gifford, are not admissible.  However, because the Defendant's

subsequent statements to Officer Gifford were given after full and careful administration of the

Miranda warnings, they are admissible.  See Oregon v. Elstad, 470 U.S. 298 (1985).  In Elstad,

the Supreme Court held that "ordinarily," providing Miranda warnings "should suffice" to cure

an officer's failure to initially provide Miranda warnings:

> It is an unwarranted extension of Miranda to hold that a simple failure to
> administer the warnings, unaccompanied by any actual coercion or other
> circumstances calculated to undermine the suspect's ability to exercise his free
> will, so taints the investigatory process that a subsequent voluntary and informed
> waiver is ineffective for some indeterminate period.  Though Miranda requires
> that the unwarned admission must be suppressed, the admissibility of any

subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made. . . .  A subsequent administration of <u>Miranda</u> warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.

<u>Id.</u> at 309, 314.

The Supreme Court in <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), created a limited exception to <u>Elstad</u> that applies where police engage in a "strategy" to undermine <u>Miranda</u> by employing a "two-step" interrogation technique, in which the police first elicit a pre-<u>Miranda</u> confession in a manner that is "systematic, exhaustive, and managed with psychological skill," and then try to elicit the same admission after administering <u>Miranda</u> warnings.  <u>Id.</u> at 616.  In <u>Seibert</u>, the police interrogated the defendant at length and then, with only a short break, Mirandized her, confronted her with her earlier statement, and elicited a nearly identical confession.  <u>Id.</u> at 616-17.  The Supreme Court suppressed the pre and post-<u>Miranda</u> statements in that case.

Justice Kennedy, who supplied the fifth concurring vote in <u>Seibert</u>, set forth the controlling test, and held that <u>Elstad</u> continues to permit the admission of the second, post-<u>Miranda</u> statement unless the police employ a two-step interrogation technique "in a calculated way to undermine the <u>Miranda</u> warning."  <u>Id.</u> at 622; <u>see also</u> <u>United States v. Naranjo</u>, 426 F.3d 221, 231-32 (3d Cir. 2005) (holding that Justice Kennedy's concurrence should be viewed as the Supreme Court's holding in <u>Seibert</u>).  Justice Kennedy noted that, in <u>Seibert</u>, "[t]he officer confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them."  <u>Id.</u> at 621.  He held that that "technique . . . distorts the meaning of <u>Miranda</u> and furthers no legitimate countervailing interest," and that "postwarning statements

16

that are related to the substance of prewarning statements must be excluded absent specific, curative steps." Id.

The evidence shows that, here, Elstad, rather than Seibert, applies. First of all, there is no evidence that Officers Ciritella or Gifford engaged in a calculated attempt to undermine the Miranda warnings when they interviewed the Defendant about unrelated matters before advising him of his rights. Rather, Officer Ciritella made it clear from the beginning of the interview that he wanted to talk to the Defendant about a murder to which the Defendant might be a witness, not about the gun that was found in the Defendant's car. (See Govt. Ex. 5 at 23:06 (Officer Ciritella explaining to the Defendant, "Right, but I'm not talking to you about your case right now.").)

Likewise, Officer Gifford told the Defendant that, initially, he wanted to talk to the Defendant about the shooting in which the Defendant was a victim, telling the Defendant, "I want to go over this shooting thing with you, real quick, again." (Id. at 36:04 – 36:14.) Officer Gifford then asked the Defendant questions that solely related to the shooting. When the Defendant tried to make a statement about the gun, Officer Gifford interrupted the Defendant to make sure he was aware of his rights before speaking. (Id. at 48:07 ("All right, well before I talk to you about the gun, though, I got to advise you of your rights just because that's what you're here for, ok? Do you understand that?").) Under the circumstances, it is clear the Officers were *not* trying to get the Defendant make a pre-Miranda confession. To the contrary, they took steps to make sure that the Defendant did not make any incriminating statements about the gun before being advised of his rights. Seibert, therefore, does not apply. See United States v. Gonzalez-Lauzan, 437 F.3d 1128, 1139 (11th Cir. 2006) ("we cannot say that the two-step technique

17

employed here is of the type that was the narrow focus of Justice Kennedy's opinion" because "[t]he first phase here did not seek to elicit any incriminating statements with which to cross-examine Gonzalez-Lauzan in order to pressure him to repeat them and thereby undermine the Miranda warnings").

Also, Justice Kennedy would apply Elstad except where the Government tries to introduce "postwarning statements that are related to the substance of prewarning statements . . ." Seibert, 542 U.S. at 621. Here, the Officers did not elicit any prewarning statements related to the substance of the Defendant's postwarning statements. In his postwarning statements, the Defendant claimed his "Mom" owned the gun that was found in his car. He never mentioned his mother in his prewarning statements. For this reason also, Seibert does not apply. Under Elstad, the admissibility of the Defendant's post-Miranda statements should be determined "solely on whether it is knowingly and voluntarily made." Elstad, 470 U.S. at 309. As explained above, because the Defendant knowingly, voluntarily, and intelligently waived his Miranda rights, the Defendant's post-Miranda statements should be admitted.

**E.    *Even if Missouri v. Seibert Applies, The Defendant's Post-Miranda Statements Are Still Admissible.***

Even if Seibert applies, the Defendant's post-warning statements are admissible under both the plurality's multi-factor test and Justice Kennedy's narrower test. The plurality in Seibert would apply five factors to determine "whether Miranda warnings delivered midstream could be effective enough to accomplish their object: [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5]

18

the degree to which the interrogator's questions treated the second round as continuous with the first." Seibert, 542 U.S. at 615. The totality of these factors favor admission of the Defendant's post-Miranda statements.

The first factor favors admission because Officers Ciritella and Gifford did not ask the Defendant any questions about the gun before advising him of his Miranda rights. Thus, the pre-Miranda interviews with the Defendant were neither complete nor detailed. The second factor favors admission because the pre and post-Miranda interviews covered wholly separate subjects. The fifth factor favors admission because Officer Gifford made it clear to the Defendant that the interview was entering a new phase before he asked the Defendant questions about the gun. (See Govt. Ex. 5 at 48:07 ("I'm talking to you as a victim right now in this thing I don't got to advise you of your rights, you're going to tell me or you're not going to tell me. But because you want to talk to me about the gun I got to advise you of your rights, do you understand that?").) The fourth factor also favors admission because two different officers questioned the Defendant making it even more evident that Officer Gifford's interview was distinct from Officer Ciritella's. Accordingly, even under Seibert, considering all of the relevant factors, the Defendant's post-Miranda statements should be admitted.

Under Justice Kennedy's narrower test, assuming the Officers employed a two-step interrogation technique "in a calculated way to undermine the Miranda warning," the Defendant's post-Miranda statements would still be admitted. Justice Kennedy held that a defendant's post-Miranda statements should still be admitted despite an improper two-step interrogation if the police take "[c]urative measures . . . designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning

and of the Miranda waiver." Seibert, 542 U.S. at 622. Here, Officer Gifford made it clear to the Defendant (and to a reasonable person) that the pre and post-Miranda interviews were distinct, that the Miranda warnings were important and should be considered, and that the Defendant did not have to answer questions about the gun just because he had answered some of the Officers' questions to that point. (See Govt. Ex. 5 at a t 48:07 ("I'm talking to you as a victim right now in this thing I don't got to advise you of your rights, you're going to tell me or you're not going to tell me. But because you want to talk to me about the gun I got to advise you of your rights, do you understand that?").) Thus, Officer Gifford took the curative measures envisioned by Justice Kennedy. As a result, even if the Officers employed an improper two-step interrogation technique (which they did not do), the Defendant's post-Miranda statements should still be admitted.

## III.    Conclusion.

WHEREFORE, for the reasons set forth above, the United States respectfully requests that the Court deny the Defendant's Motion to Suppress Physical Evidence and Inculpatory Statements. A proposed Order is attached.

Dated:   June 30, 2008.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY:        /s/ Seth M. Beausang
Seth M. Beausang (De. I.D. No. 4071)
Assistant United States Attorney
1007 N. Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046

20

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal Action No. 08-40-SLR |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| LAMOTTE STEVENSON, a/k/a | : | |
| LAMONT STEVENSON, | : | |
| | : | |
| Defendant. | : | |

**ORDER**

AND NOW, this ___ day of _____, 2008, after consideration of

Defendant's Motion to Suppress Statements (Doc. No. 13), and all evidence and filings offered

in support thereof and opposition thereto, IT IS ORDERED that Defendant's Motion is DENIED.

IT IS SO ORDERED.

_____
THE HONORABLE SUE L. ROBINSON
UNITED STATES DISTRICT COURT JUDGE