IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 08-40-SLR |
| | : | |
| LAMOTTE STEVENSON, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

Defendant, Lamotte Stevenson, by and through his undersigned counsel, Eleni Kousoulis,

Assistant Federal Public Defender, respectfully submits this Memorandum of Law in support of his

Motion to Suppress Statements. For the reasons set forth below, this Court should exclude the

Government's admission, at trial, of any and all statements that were obtained in violation of Mr.

Stevenson's Fifth Amendment rights.

## I. **INTRODUCTION**

On March 4, 2008, the Grand Jury for the District of Delaware returned a one-count

Indictment with Notice of Forfeiture against Mr. Stevenson, charging him with possession of a

firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). On May 12, 2008, Mr. Stevenson

filed a Motion to Suppress Statements, arguing that he was arrested without probable cause or

reasonable suspicion, in violation of the Fourth Amendment, and that any statements made by him

to police were taken in violation of his Fifth Amendment rights.

On June 11, 2008, this Court conducted an evidentiary hearing to determine Mr. Stevenson's

motion. On June 30, 2008, the Government filed its Post-Hearing Brief In Opposition To Defendant's

Motion To Suppress Statements, asserting that officers had probable cause to arrest Mr. Stevenson, and that he knowingly and intelligently waived his <u>Miranda</u> rights. Mr. Stevenson now files his Response Brief.

## II.  <u>PROPOSED FINDINGS OF FACT</u>

At the evidentiary hearing, the Government presented the testimony of Detective Michael Gifford.  The relevant hearing testimony is summarized as follows.

On February 10, 2008 at approximately 12:27 a.m., Detective Michael Gifford heard two radio transmissions, which reported that: officers were pursuing a vehicle traveling at a high rate of speed through Wilmington to St. Francis Hospital, and a shooting victim was inside the vehicle; and shots had been fired at the BP gas station at Martin Luther King and West Street.  (Tr. 4-5, 18-19). Detective Gifford responded to St. Francis Hospital and observed a vehicle with several bullet holes and the driver's side window shot out, outside of the hospital.  (<u>Id.</u> at 5, 20-21).

Patrolman Rennewanz informed Detective Gifford that a gun was inside the vehicle, and that Mr. Stevenson, the victim, was inside the hospital with Patrolman Souden.  (<u>Id.</u> at 5-6, 21-22). Detective Gifford testified that he knew Mr. Stevenson had prior felony convictions.  (<u>Id.</u> at 6, 22). Detective Gifford further testified that he saw the gun in the vehicle, and that it was located on the driver's side floor board.  (<u>Id.</u> at 7-8).

Detective Gifford interviewed Mr. Stevenson at St. Francis Hospital before he was subsequently transported to Christiana Hospital.  (<u>Id.</u> at 9, 23-24).  Detective Gifford testified that at the time of this interview, he knew that Mr. Stevenson was prohibited from having a firearm, but he did not advise him of his <u>Miranda</u> rights because he "didn't ask him about the gun . . . [and] was concerned about his welfare, well-being extent of his injuries and who had shot him."  (<u>Id.</u> at 23-24).

2

Following Mr. Stevenson's surgery at Christiana Hospital, Detective Gifford interviewed him for a second time. (Id. at 24-25). Detective Gifford testified that a decision had been made "eventually" about whether to arrest Mr. Stevenson for having the firearm, but he was "still not concerned about that" because he "wanted to catch the [person] that shot him." (Id. at 24). Detective Gifford further testified that no officer informed Mr. Stevenson that he was going to be arrested because of the gun, and the "only reason any officer was with him at any time up until his discharge was to collect any evidence, because Mr. Stevenson still had a bullet in his hand, and . . . I needed that as evidence." (Id. at 25-27). Detective Gifford arrested Mr. Stevenson upon his discharge from the hospital, transported him to the Wilmington Police Station and notified him that he was being charged under the FED UP program. (Id. at 9, 28).

Within one hour of his arrest, Detective Gifford and Officer Ciritella conducted two recorded interviews of Mr. Stevenson, who still had the bullet in his hand. (Id. at 10, 32). See also, Gov't's Ex. 5. Detective Gifford testified that he was aware that Detective Ciritella did not advise Mr. Stevenson of his Miranda rights, and that Officer Ciritella had advised Mr. Stevenson about the FED UP program, and questioned him about Shannon Johnson, an associate of his that had been arrested for murder. (Id. at 12, 29). Detective Gifford stated that Mr. Stevenson indicated that he did not have anything to say to Detective Ciritella. (Id. at 30).

Detective Gifford testified that at the beginning of his interview with Mr. Stevenson, he did not advise him of his Miranda rights because "he was interviewing him as a victim to the shooting originally, and I was trying to get as much detailed information as I possibly could from him at that point in time." (Id. at 12). Detective Gifford testified that he informed Mr. Stevenson that he was questioning him about being a shooting victim, and not because of the gun, and he admitted that he

3

lied to Mr. Stevenson about whether the interview was being taped.  (<u>Id.</u> at 30-31).  Detective Gifford

testified that he advised Mr. Stevenson of his <u>Miranda</u> rights after he began to ask about the gun and

whether it was the cause of his arrest.  (<u>Id.</u> at 13-15, 31).

Detective Gifford testified that Mr. Stevenson was able to answer his questions, did not

appear to be under the influence of drugs or medication, and he was able to understand Mr.

Stevenson's answers.  (<u>Id.</u> at 13-15).  During the interviews, Mr. Stevenson remained handcuffed to

a chair, which is normal procedure for victims that are "being charged with something."  (<u>Id.</u> at 27).


## III.  <u>PROPOSED CONCLUSIONS OF LAW</u>

The Fifth Amendment of the United States Constitution protects a citizen from being

"compelled in any criminal case to be a witness against himself."  US CONST. Amend. V.  In

<u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45 (1966), the Supreme Court held:

> [T]he prosecution may not use incriminating statements, whether exculpatory or
> inculpatory, stemming from custodial interrogation of the defendant unless it
> demonstrates the use of procedural safeguards effective to ensure the privilege against
> self-incrimination.  By custodial interrogation, we mean *questioning initiated by law*
> *enforcement officers after a person has been taken into custody or otherwise*
> *deprived of his freedom of action in any significant way.*  As for the procedural
> safeguards to be employed, unless other full effective means are devised to inform the
> accused persons of their right of silence and to assure a continuous opportunity to
> exercise it, the following measures are required.  Prior to any questioning, the person
> must be warned that he has a right to remain silent, that any statements he does make
> may be used as evidence against him, and that he has the right to the presence of an
> attorney, either retained or appointed.  The defendant may waive effectuation of these
> rights, provided the waiver is made voluntarily, knowingly and intelligently.

<u>Id.</u>  (emphasis added).


The Court premised this rule on the proposition that custodial interrogation is inherently

4

coercive, and individuals subject to that form of questioning must be independently protected against intrusions on their rights.  Id. at 533.  See also, Rhode Island v. Innis, 446 U.S. at 301 ("[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.");  United States v. DeSumma, 272 F.3d 176 (3d Cir. 2001) (noting that the Fifth Amendment bars the prosecution from using compelled testimony in its case in chief because the failure to administer Miranda warnings creates a presumption of compulsion, and even unwarned, voluntary statements are excluded from evidence).

"In determining whether an individual [is] in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint in freedom of movement' of the degree associated with a formal arrest.'" Stansbury v. California, 511 U.S. 318 (1994) (quoting California v. Beheler, 463 U.S. 1121 (1983)) (stating that the initial determination of custody depends on objective circumstances and not, on the subjective views of the interrogating officers or the person being questioned).  See also, Berkemer v. McCarty, 468 U.S. 420 (1984) (stating that the relevant inquiry is how a reasonable person in the suspect's position would have understood his situation); United States v. Jacobs, 431 F.3d 99 (3d Cir. 2005) (stating that if Miranda warnings are not given before a person is in custody, evidence resulting from the questioning must be suppressed).

Courts consider several factors to determine whether an individual is in custody, including "whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the

5

suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." United States v. Orejuela, No. 07-38-JJF, 2007 WL 2745708, at *5 (D.Del. Sept. 20, 2007) quoting United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006) (internal citations omitted).

### A.  Mr. Stevenson's Pre-Miranda Statements Are Inadmissible.

At the outset, the Government concedes that Mr. Stevenson's pre-Miranda statements to Officer Ciritella and Detective Gifford are inadmissible.  See Government's Post-Hearing Brief at 15. Mr. Stevenson was clearly in custody and subject to custodial interrogation for purposes of Miranda. He had been placed under arrest upon his discharge from Christiana Hospital, and had been handcuffed to a chair during questioning by the two detectives.  Both detectives asked questions about Mr. Stevenson's case and a separate incident that they knew would elicit incriminating statements.  See Rhode Island v. Innis, 446 U.S. at 301; DeSumma, 272 F.3d at 176; Orejuela, 2007 WL 2745708.  Accordingly, Mr. Stevenson's pre-Miranda statements to Officer Ciritella and Detective Gifford are inadmissible.

### B.  Mr. Stevenson's Post-Miranda Statements Are Inadmissible Pursuant to Missouri v. Seibert, 542 U.S. 600 (2004).

This Court must determine the admissibility of Mr. Stevenson's post-Miranda statements under Oregon v. Elstad, 470 U.S. 298 (1985) and Missouri v. Seibert, 542 U.S. 600 (2004). Pursuant to Elstad, "[t]hough Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made."

Thus, "absent deliberately coercive or improper tactics in obtaining the initial statement, the

mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." Id. at 314. See also, United States v. Naranjo, 426 F.3d 221, 228 (3d Cir. 2005) ("[W]here a statement is voluntary but made without the benefit of proper Miranda warnings, '[a] subsequent administration of Miranda warnings . . . should suffice to remove the conditions that precluded admission of the earlier statement. In that case, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights."); Reinert v. Larkins, 379 F.3d 76, 90 (3d Cir. 2004).

In Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court "carved out an exception to Elstad, addressing the admissibility of unwarned statements taken pursuant to an official policy of questioning suspects first without giving Miranda warnings, and then obtaining a second statement after administrating the warnings . . . As set forth in Justice Kennedy's concurrence, Elstad's legal standard applies unless a two-step interrogation technique 'was used in a calculated way to undermine the Miranda warning. " Orejuela, 2007 WL 2745708 at * 6, quoting Seibert, 542 U.S. at 622.

The Government argues that Elstad, and, not, Seibert, controls because there is no evidence that the officers deliberately engaged in an attempt to undermine Mr. Stevenson's Miranda warnings, Officer Ciritella "made it clear from the beginning of the interview that he wanted to talk . . . about a murder . . . [and] not about the gun," and Detective Gifford told Mr. Stevenson "that, initially, he wanted to talk to the Defendant about the shooting in which [he] was a victim . . . ." Government's Post-Hearing Brief at 17.

Contrary to the Government's arguments, the circumstances and timeline of this case make it clear that both officers deliberately blurred the line between the investigation of Mr. Stevenson's

shooting and the instant offense. The officers intentionally and coercively questioned him about the instant offense under the guise of investigating the crime against him, and only provided <u>Miranda</u> warnings after eliciting incriminating information against him. Thus, <u>Seibert</u>, and not, <u>Elstad,</u> controls this case.

First, Detective Gifford immediately knew upon hearing Mr. Stevenson's name that he was a convicted felon and could not possess a firearm. Detective Gifford questioned Mr. Stevenson at St. Francis Hospital and Christiana Hospital about the shooting and conceded that a decision had been made "eventually" about arresting Mr. Stevenson for having the firearm. Thus, despite Detective Gifford's alleged concern for wanting to catch the person that shot Mr. Stevenson, he also knew that the shooting investigation extended to charging Mr. Stevenson for the instant offense.     Second, upon Mr. Stevenson's discharge, Detective Gifford arrested him for the instant offense, but, remarkably, did not provide his <u>Miranda</u> warnings at that time. Providing <u>Miranda</u> warnings at that time would have made it clear to Mr. Stevenson that any further statements, <u>regardless of whether they were about the shooting or the instant offense</u>, could be used against him. Instead, however, the officers took Mr. Stevenson to an interrogation room, handcuffed him to a chair and began questioning him without <u>Miranda</u> warnings.

Third, despite conceding that Officer Ciritella questioned Mr. Stevenson in violation of his Fifth Amendment rights, the Government argues that Officer Ciritella made his intentions clear to Mr. Stevenson at the beginning of the interview. While it is true that Officer Ciritella questioned Mr. Stevenson about an incident involving an associate of his, he also told him that he was being charged under the FED-UP program and explained the program in detail. After this explanation, Mr. Stevenson told Officer Ciritella that the gun was not his. Any reasonable officer would know that

discussing a case with an arrested individual is likely to elicit an incriminating response, and the Government offers no evidence or explanation as to why Officer Ciritella questioned or explained any aspect of Mr. Stevenson's case to him without following <u>Miranda</u>'s procedural safeguards.

Six minutes after Detective Ciratella questioned Mr. Stevenson, Detective Gifford allegedly interrogated him "as a victim," and not because of the gun. This assertion is not only disingenuous, but a deliberate and egregious attempt to circumvent Mr. Stevenson's Fifth Amendment's rights.

After Mr. Stevenson was questioned for twelve minutes concerning his victimization in the shooting to which a bullet was still lodged in his hand, Detective Gifford abruptly stated: "I heard what you told me about the gun, I heard what you told Officer Ciritella about the gun." <u>Cf.</u> <u>Seibert</u>, 542 U.S. at 615 (noting the warned phase proceeded after only a 15-to-20 minute pause, in the same place and with the same officer, who did not advise Seibert that her prior statement could not be used against her). Detective Gifford then advised Mr. Stevenson that he had to read his <u>Miranda</u> rights because "that is what [ Mr. Stevenson] was there for."

During the evidentiary hearing, Detective Gifford also admitted that he lied to Mr. Stevenson about whether the interview was being taped, which falls in line with his coercive or otherwise improper behavior and desire to "get as much detailed information" before Mr. Stevenson had the opportunity to exercise his Fifth Amendment rights. The officers' tactics were a deliberate and improper attempt to undermine Mr. Stevenson's rights, particularly given the closely related nature of the shooting and the instant offense. As previously argued, given the related nature of both incidents, and Detective Gifford's statements to Mr. Stevenson regarding the real reason for his questioning, any questions regarding one incident would produce responses in connection to the other incident.

Finally, Mr. Stevenson notes that in <u>Elstad</u>, neither the environment nor the interrogation was coercive when the defendant made the pre-<u>Miranda</u> incriminating statements. <u>Id</u>. at 315. Instead, the initial conversation between the defendant and the officers took place midday, in the living room of the defendant's home, with his mother a few steps away. <u>Id</u>. In <u>Reinert</u>, 379 F. 3d at 76, the Third Circuit explained: "it is fair to read <u>Elstad</u> as treating the living room conversation as a good faith <u>Miranda</u> mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn first generally. <u>Id</u>. at 91 (<u>quoting</u> <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004)). Here, however, the detectives clearly employed the coercive, two-step questioning practice that was disavowed by the Supreme Court in <u>Seibert</u>, and Mr. Stevenson's statements must be suppressed.

## IV.  <u>CONCLUSION</u>

For the reasons set forth, Mr. Stevenson submits that all statements obtained in violation of his Fifth Amendment rights must be excluded at trial.

Respectfully submitted,


 _/s/  Eleni Kousoulis_            
Eleni Kousoulis, Esquire
Assistant Federal Public Defender
One Customs House
704 King Street, Suite 110
Wilmington, DE 19801
(302) 573-6010
ecf_de@msn.com

Attorney for Defendant, Lamotte Stevenson

Dated: July 14, 2008