IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,              )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )    Crim. No. 08-40-SLR
                                       )
LAMOTTE STEVENSON,                     )
                                       )
          Defendant.                   )

**MEMORANDUM ORDER**

## I. BACKGROUND

On March 4, 2008, a grand jury returned a one-count indictment with notice of

forfeiture against defendant Lamotte Stevenson charging him with possession of a

firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  (D.I. 9)  Defendant

filed a motion to suppress statements made to police following his arrest on February

10, 2008.[1]  (D.I. 13)  An evidentiary hearing was held on June 11, 2008.[2]  (D.I. 21)

Post-hearing briefing is complete.  (D.I. 23, 24, 25)  The court has jurisdiction pursuant

to 18 U.S.C. § 3231.  For the reasons that follow, defendant's motion to suppress will

be denied.

---

[1]Defendant initially sought to suppress pre-*Miranda* and post-*Miranda*
statements.  (D.I. 13)  Because plaintiff has since conceded that the pre-*Miranda*
statements made to Officer Ciritella are not admissible, the court's focus is the
admissibility of the post-Miranda statements provided to Detective Gifford.  (D.I. 24, 25)

[2]Testifying on behalf of plaintiff was Wilmington Police Department ("WPD")
Detective Mike Gifford ("Detective Gifford").  Detective Gifford has been a police officer
for approximately nine years, three of which as a detective.  (*Id.* at 14)

## II. FINDINGS OF FACT

Pursuant to Fed. R. Crim. P. 12(d), the following constitutes the court's essential findings of fact as developed during the evidentiary hearing. (D.I. 21)

1. On February 10, 2008, at approximately 12:30 a.m., Detective Gifford, while on duty, heard two separate calls over his police radio. (*Id.* at 4) The first call reported that a car was traveling at a high rate of speed and blowing through traffic lights in the City of Wilmington. The car "ended up stopping at the St. Francis Hospital ("St. Francis") and had a victim who was shot inside the vehicle." (*Id.*) Immediately after that transmission, Detective Gifford heard a second call indicating that shots had been fired at a BP gas station located at Martin Luther King Boulevard and West Street in Wilmington.

2. Detective Gifford responded to St. Francis within 20 minutes of receiving the calls. Upon arrival, Gifford observed WPD Officer Rennewanz standing alongside a car that had sustained multiple bullet holes and had its driver's side window shot out. (*Id.* at 5) Officer Rennewanz informed Detective Gifford that he had followed the car to St. Francis and that his partner, Officer Souden, was inside the hospital with the shooting victim.[3] (*Id.* at 4-5) Officer Rennewanz told Detective Gifford that there was a gun located inside the car. Standing from outside of the car, Detective Gifford observed a gun on the driver's side floor board. (*Id.* at 7-8) Detective Gifford also noticed blood inside the car on the arm rest, steering wheel and both front seats. (*Id.* at 21) Officer

---

[3]Defendant Lamotte Stevenson was the victim of the shooting at the BP gas station ("BP shooting"). Defendant was shot in the wrist, abdomen and chest area. (*Id.* at 5-6, 23) Injured and bleeding, defendant drove himself to St. Francis.

2

Rennewanz told Detective Gifford that defendant, the only victim, was seen exiting the car and that no other civilians had been around the car since its arrival at St. Francis. (*Id.* 5-6) Detective Gifford advised Officer Rennewanz to continue making sure the car was secured and then proceeded into St. Francis. (*Id.* at 32, 21)

3. Because Detective Gifford was familiar with defendant's name and criminal history which included some prior felony convictions, he knew that defendant was prohibited from possessing a gun. (*Id.* at 7, 23-24) Detective Gifford interviewed defendant at St. Francis, focusing only on the BP shooting where he was the victim. (*Id.* at 24, 7-8, 23; GX1, GX2, GX3) Detective Gifford did not advise defendant of his *Miranda* rights during this interview because he "didn't ask [defendant] about the gun" and because "at that point in time, [he] was concerned about [defendant's] welfare, well-being, extent of his injuries and who had shot him." (*Id.* at 24)

4. Sometime after the interview, defendant was transferred from St. Francis to Christiana Hospital ("Christiana") to undergo surgery. (*Id.* at 24) While at Christiana, Detective Gifford interviewed defendant a second time, again without advising him of his *Miranda* rights, because the questioning was about the BP shooting as Detective Gifford was "worried about [defendant's] well-being, his recovery, and the fact that he's a victim of a shooting." (*Id.* at 24) A decision to arrest defendant for possession of a gun by a person prohibited had not been made at that point. Before leaving Christiana, Detective Gifford requested that the hospital notify him if defendant were to be discharged. (*Id.* at 26)

3

5. The next day, February 11, 2008, Detective Gifford was informed that defendant was being discharged from Christiana. (Id. at 9) Detective Gifford, along with someone from the Alcohol, Tobacco, and Firearms ("ATF") task force, went to Christiana and arrested defendant as a felon in possession of a firearm ("federal charges").[4] (Id. at 27)   Defendant was transported to the WPD Station.[5] (Id. at 9-10) Once at the police station, defendant was placed in a interview room that contained two chairs and one small table. (GX5) Defendant was seated with one arm handcuffed to the chair. (Id. at 27)   Detective Gifford testified that victims of crimes are not usually handcuffed unless they are being charged with something. At this time, defendant had yet to undergo surgery to remove a bullet in his hand. (Id. at 32)

5. Within an hour of his arrest, WPD Officer Ciritella interviewed defendant.[6] (Id. at 29, 32)  In total, the interview conducted by Officer Ciritella lasted eight minutes and sixteen seconds; at no point did Officer Ciritella advise defendant of his Miranda rights. (GX5 at 21:44 - 30:00)  For the entire interview, Officer Ciritella stood along the side of the table, closest to defendant who remained seated and handcuffed. Officer Ciritella commenced the interview by informing defendant that he was being charged with a federal gun offense pursuant to the FED UP program. (Id. at 21:50 - 22:15)

---

[4]Detective Gifford explained that it is the WPD protocol for cases involving a convicted felon with a gun to notify ATF to determine if AFT wants to "deal with the case." (Id. at 27-28)

[5]Defendant was not advised of his Miranda rights at the time of his arrest. Detective Gifford testified that he intended to get a videotaped statement from defendant regarding the BP shooting. (D.I. 21 at 26)

[6]Both interviews were videotaped, unknown to defendant. (GX5) Detective Gifford gave ATF a copy of the recorded interview. (Id. at 10)

4

Officer Ciritella then asked defendant if he had any information about a murder involving a suspect and purported associate of defendant, Shannon Johnson ("Johnson"). (*Id.* at 12, 29)  Officer Ciritella told defendant that "you may want to think about that as a, uh alternative for you because with the FED UP program, ain't nobody getting out, you know what I mean?" (*Id.* at 22:23 - 22:35)  Defendant stated that he had no information on that case and only wanted to talk about his own case.  Officer Ciritella replied that he was not talking to defendant about his case right now and that defendant was "not under arrest on the other cases."  Speaking about the federal gun charge for which he was under arrest, defendant said "it wasn't even my gun, so I'm not even worried about this shit at all." (*Id.* at 22:41 - 23:27)  At a later point in the interview, defendant stated that he needed surgery and should not have been taken from the hospital, to which Officer Ciritella asked defendant, "you're on probation right?" followed by "you got a gun in the car" and "you violated your probation . . . you need to get arrested."  Defendant responded affirmatively to this line of questions and statements. (*Id.* at 24:38 - 25:15)  The interview then briefly shifted to whether defendant would be found guilty on the gun charge. (*Id.* at 25:28 - 26:23)  The remainder of the interview focused on the pending charges and trial of Johnson. (*Id.* at 26:24 - 30:00)

6.  Approximately six minutes after Officer Ciritella left the room, Detective Gifford entered and sat down directly across from defendant.  He began questioning defendant about the BP shooting.[7] (*Id.* at 36:05)  Detective Gifford did not advise

---

[7]Twice during the interview, Detective Gifford told defendant that the interview was not being video recorded although it, in fact, was being recorded. (GX 5 at 40:13,

defendant of his *Miranda* rights at the start of the interview because "[he] was interviewing him as a victim to a shooting originally, and [he] was trying to get as much detailed information as [he] possibly could from him at that point in time." (D.I. 21 at 12; 30) Detective Gifford told defendant that he was trying to help him. The portion of Detective Gifford's interview centering on the shooting lasted approximately twelve minutes.[8] (GX5 at 36:05 - 48:00)

7. Part way through the interview, Detective Gifford changed the focus of the interview to the federal charge against defendant: "I've heard what you told me about the gun, I heard what you told [Officer] Ciritella about the gun . . . " He followed that statement up by telling defendant that he needed to advise defendant of his rights "because that's what you are here for." (*Id.* at 47:57 - 48:12) Detective Gifford verbally administered *Miranda* warnings to defendant, asking defendant after each right contained in the warning whether he understood that particular right. Defendant stated that he understood all of his rights and agreed to talk to Detective Gifford about the gun. (*Id.* at 48:24 - 48:52) Detective Gifford chronicled the events of that night leading up to the police finding the gun and pointed out to defendant that he was the only individual seen in the car. (*Id.* at 48:52 - 49:56) Detective Gifford then said to defendant, "if it's not your gun, whose gun is it . . . so tell me about the gun." (*Id.* at 49:56) Defendant replied that it was his mother's gun. (*Id.* at 50:07) Shortly after this statement by defendant, Detective Gifford changed the subject of the interview to an unrelated

---

42:58; D.I. 21 at 30)

[8]During the interview, Detective Gifford left the room to retrieve a key to remove defendant's handcuff. (GX5 at 40:47 - 42:10)

6

murder that occurred about a year ago. Detective Gifford tried repeatedly to convince defendant to tell him what he knew about the murder. The remainder of the interview centered around that investigation. (*Id.* at 51:20 - 103:45) In total, Detective Gifford's interview lasted approximately twenty-eight minutes.

## III. CONCLUSIONS OF LAW

8. The Fifth Amendment of the United States Constitution "prohibits the prosecution from introducing a defendant's statements made during a custodial interrogation, unless he is advised of the procedural safeguards protecting his right against self-incrimination." *United States v. Yamba*, 407 F. Supp.2d 703, 717 (W.D. Pa. 2006). To that end, the United States Supreme Court created the *Miranda* warnings for law enforcement to follow prior to interrogation of a suspect in order to combat the compelling pressures inherent in custodial police interrogation and to permit an opportunity to exercise the privilege against self-incrimination guaranteed by the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436 (1966); *United States v. Green*, __ F.3d ___, 2008 WL 4014129 *7 (3d Cir. Sept. 2, 2008). Before any questioning, the suspect must be informed that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 385 U.S. at 445. If a suspect invokes his right to counsel, all questioning by the police must stop until counsel has been made available to the suspect, unless the suspect initiates conversations with the police. *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989).

9. Statements obtained in violation of *Miranda* precepts, even though the statements may have been voluntarily given, are inadmissible to prove guilt at trial. *Michigan v. Mosely*, 423 U.S. 96, 100 (1975); *Miranda*, 384 U.S. at 458-59. "Any statements or testimonial acts made prior to the administration and voluntary waiver of Miranda rights are 'irrebutably presumed involuntary' and may not be used in the prosecution's case-in-chief." *United States v. Green*, __ F.3d ___, 2008 WL 4014129, at *7 (*quoting United States v. Pacheco-Lopez*, 531 F.3d 420, 424 (6th Cir. 2008)).

10. Defendant claims that the circumstances and time-line of the interrogations demonstrate that Detective Gifford and Officer Ciritella employed the two-step questioning technique disavowed by the Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004). (D.I. 24) Specifically, defendant contends that the officers deliberately blurred the line between the investigation of the BP shooting and the federal charges. The officers only administered *Miranda* warnings after eliciting incriminating evidence from defendant.

11. Conversely, plaintiff disputes that the record demonstrates the officers employed any deceptive techniques and argues there is no evidence that the officers engaged in a calculated attempt to undermine the *Miranda* warnings when they interviewed defendant about unrelated matters before advising him of his rights. Plaintiff contends that suppression of the statements is unwarranted under *Oregon v. Elstad*, 470 U.S. 298 (1985). Plaintiff submits that officers did not elicit any incriminating information from defendant during the pre-*Miranda* interviews; instead, defendant made a statement about the gun, not in response to questioning, but after

8

Officer Ciritella told defendant that he wanted to question him about an unrelated

matter. The only incriminating information elicited from defendant occurred after

*Miranda* warnings were administered and waived by defendant.

12. In *Elstad*, the Supreme Court considered the admissibility of a custodial

statement that police obtained after they had first questioned a suspect without

administering *Miranda* warnings. Subsequently, police administered *Miranda* warnings

and obtained a voluntary waiver before the defendant gave a second statement. In

rejecting the defendant's contention that his first unwarned statement tainted the

second confession, rendering it inadmissible, the Court explained:

> It is an unwarranted extension of *Miranda* to hold that a
> simple failure to administer warnings, unaccompanied by any actual
> coercion or other circumstances calculated to undermine the
> suspect's ability to exercise his free will, so taints the investigatory
> process that a subsequent voluntary and informed waiver is
> ineffective for some indeterminate period.

*Id.* at 310. Further, the "transgression [in *Elstad*] did not mandate automatic exclusion

of the post-warning statement." *United States v. Naranjo*, 426 F.3d 221, 228 (3d Cir.

2005). Rather, the totality of the circumstances surrounding both statements, as well

as the entire course of police conduct, had to be examined to determine whether the

suspect made a rational and intelligent choice to waive or invoke his *Miranda* rights.

*Elstad*, 470 U.S. at 318.

13. Nearly twenty years later, the Supreme Court carved an exception to *Elstad*

in considering a case where police employed a two-step interrogation technique,

"question first, *Mirandize* later." *Missouri v. Seibert*, 542 U.S. 600 (2004) (Kennedy, J.

9

Case 1:08-cr-00040-SLR Document 27 Filed 09/18/08 Page 10 of 13 PageID #: 122

concurring[9])). The Court "held that where police make a conscious decision to withhold *Miranda* until after interrogating and obtaining a confession, all subsequent incriminating statements, even those made after the mid-interrogation provision of *Miranda* warnings are rendered inadmissible." *United States v. Green*, __ F.3d ___., 2008 WL 4014129, at *9 (on-the-record statement by DEA agent that his omission of *Miranda* warnings was the result of a deliberate and calculated plan).

14. The threshold inquiry, "when confronted with a statement challenged on the 'question first, *Mirandize* later' grounds, is whether the timing of the *Miranda* warning was the product of a deliberate law enforcement tactic to withhold the requisite warnings at the commencement of questioning." *Id.* at *10; *United States v. Naranjo*, 426 F.3d at 231-32; *United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006). Post-*Miranda* statements which relate to pre-*Miranda* admissions are presumptively inadmissible unless the court finds that "the second interrogation session was carried out under sufficiently different circumstances so as to have cured the initial taint." *Green*, 2008 WL 4014129 *11. Ultimately, "[c]urative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and *Miranda* waiver." *Seibert*, 542 U.S. at 622.

15. Considering this record against the above authority, the court concludes that officers did not deliberately employ a two-step interrogation technique directed to

---

[9]The Third Circuit has held that Justice Kennedy's concurring opinion should be viewed as the Court's holding in *Seibert* because "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Naranjo*, 426 F.3d at 231 quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)).

10

undermining defendant's *Miranda* warnings and, accordingly, *Elstad* (not *Seibert)*
applies to determine the admissibility of defendant's statements to Detective Gifford.
Having viewed the videotape many times, the court is unable to conclude that the initial
violation of *Miranda* (Officer Ciritella's interrogation) was an intentional withholding of
*Miranda* or part of a plot by the officers to prevent defendant from invoking his rights to
gain his confession. *Compare United States v. Green*, 2008 WL 4014129, at *12
("[DEA agent] openly stated at the suppression hearing that he intentionally refrained
from advising [defendant] of his *Miranda* prior to showing the video [recording of the
defendant purportedly selling narcotics]"). In so doing, the court credits the testimony of
Detective Gifford. *United States v. McKneely*, 6 F.3d 1447, 1452-53 (10th Cir. 1993)
(court is charged with reviewing the "credibility of witnesses and the weight to be given
the evidence, together with the inferences, deductions and conclusions to be drawn
from the evidence."); *see Government of the Virgin Islands v. Gereau*, 502 F.2d 914,
921 (3d Cir. 1974).

16. It is the government's burden to demonstrate, by a preponderance of the
evidence, that a defendant's waiver of his *Miranda* rights was voluntary, knowing and
intelligent. *United States v. Wooding*, 530 F. Supp.2d 681, 685 (D. Del. 2008);
*Colorado v. Connolly*, 479 U.S. 157, 168 (1986). "The statement must be given
voluntarily in the sense that it was the 'product of a free and deliberate choice rather
than the result of intimidation, coercion or deception' " and [t]he waiver must be knowing
and intelligent, in the sense that it was 'made with a full awareness both of the nature of
the right being abandoned and the consequences of the decision to abandon it.'"

11

*United States v. Whitney,* Crim. No. 07-28-JJF, 2008 WL 2048182, at \*9 (D. Del. May, 9, 2008) quoting *United States v. Sriyuth*, 98 F.3d 739, 748-49 (3d Cir. 1996)).

17. In evaluating the validity of a waiver, courts should examine the totality of the circumstances, including the defendant's age, education and experience with the criminal justice system, as well as the length and conditions surrounding the questioning. *United States v. Velasquez*, 885 F.2d 1076, 1087 (3d Cir. 1989); *United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005).*

18. The uncontroverted record reflects that defendant knowingly, intelligently and voluntarily waived his *Miranda* rights before answering Detective Gifford's questions. Specifically, the videotape reveals that Detective Gifford clearly alerted defendant that before they spoke about the gun, he had to receive *Miranda* warnings. After listening to Detective Gifford recite the warnings, defendant acknowledged he understood those rights and then answered questions. There is no evidence of record demonstrating that defendant asked for clarification of his *Miranda* warnings or that he had any impairment in comprehension due to injuries. Further, defendant's refusal to speak to Officer Ciritella suggests he understood and exercised his right to not answer questions.

19. The court credits Detective Gifford's testimony at the evidentiary hearing as buttressing the chronology evinced on the videotape. Detective Gifford admitted he lied to defendant in an apparent attempt to obtain information. Lies told by the police, however, "do not necessarily make a confession involuntary; rather, this is simply one factor to consider out of the totality of the circumstances." *United States v. Vasquez,*

885 F.2d at 1088. During the entire interview, Detective Gifford, sitting directly across from defendant, spoke calmly and respectfully; Detective Gifford retrieved the key to remove the handcuff and acknowledged the pain and discomfort defendant was likely feeling. Detective Gifford did not use any threats, intimidation or physical force against defendant. Conversely, Officer Ciritella stood next to the seated defendant and repeatedly warned him of the consequences of the federal charges unless he cooperated against certain associates. Detective Gifford's conduct, when weighed against the complete record of the interrogation, does not make defendant's statements involuntary.

## IV. CONCLUSION

At Wilmington this 18th day of September, 2008,

IT IS ORDERED that:

1. A telephonic status conference is scheduled for **Wednesday, October 1, 2008** at **9:00 a.m.**, with the court initiating said call.

2. The time between this order and **October 1, 2008** shall be excluded under the Speedy Trial Act, 18 U.S.C. § 3161, et seq.

United States District Judge

13